May it please the Court, I'm Florence Brummer on the CJA panel for Bantam, Arizona, representing the inmate, Mr. Fowler. You want to close out just a little bit? Sure. I'd like to preserve three minutes for rebuttal, and I understand that I need to watch my own time.  Mr. Fowler was convicted of manslaughter, involuntary manslaughter, and aggravated assault, resulting in a bodily injury on his 10-year-old, potentially old daughter. This is a highly emotional case, where it would be understandable for the jury to want some sort of justice for this inmate, and it makes these issues all the more important. The government's theory of this case, and what the government argued throughout trial, was that Mr. Fowler, out of frustration, massively injured the baby's brain by doing some sort of shaking, possibly, and that her life could not be saved after this incident. The government identified Mr. Fowler as the one perpetrator who could have done it, and basically argued that it had to happen in the way that they had set forth their evidence that Mr. Fowler was watching the newborn, the 10-year-old baby, and then also watching his year-and-a-half-old daughter, became frustrated because the baby was crying, and picked her up, and did some sort of shaking, causing the injury. As part of this theory, though, the government ignores the evidence of the broken bones throughout this baby's body. She had a broken clavicle, ribs, hip, she had a skull fracture that was possibly from an earlier time period, and where those come from is not addressed by the government. Also, was that discussed with the jury at the trial? Where it came from, no, not really. It was more, how it was discussed was it existed, and most likely they were older injuries, but there was never anyone who was a potential case of the perpetrator. And how it was brought up into the government's theory of the injury that caused her death, that they argued that caused her death, was that this child was in pain due to these broken bones, and was screaming, and the defendant became frustrated, picked her up, and shook her. But where it came from originally, I can't really defend. But that doesn't stir you that someone else must have been injuring this baby all along, and that's really the cause? Yeah, when I looked back at the defendant's arguments and cross-examination, and then at their closing argument, I do believe that was argued. There was some argument that the child was with the mother of the child, and with her aunt prior, and that there were also family members in babysitting for the child throughout the child's true life. It seems, the reason I ask is that it seems that the evidence is mixed here, and maybe it's unclear who committed this crime, but it seems that the jury made a decision about who they thought did commit the crime, and it's hard for us at this point to say that they decided that incorrectly when there's evidence both ways. Yeah, that's correct. And there was evidence that went both ways, and conflicted evidence, I think, that was represented by both the state and the defense. But that's why we've appealed to the Supreme Court to resolve these issues, and that was one of the substantial evidence standards. It's very hard. I mean, if there is evidence that would support the verdict, we can't really do anything in spite of that. I'm not sure how you can say there isn't evidence to support what the jury found. There is evidence to support what the jury found, because there was the training physicians who said that the child died from this acceleration-deceleration injury, and so there was evidence from the government side of what they were saying, what the injury was that caused the death, but there was also conflicted evidence about when it occurred, which really, the only thing that really pinpointed the defendant as the person who caused it, and this is going into the second issue regarding his statement, was the statements that he made when he was interviewed by an investigator later, Detective Lee. And so in those statements, he says, and there was a motion to suppress that was filed where it was asked that these statements be suppressed and the court did not suppress them, and the statements that came out were basically, they were coerced statements, and also if you look through, there's two places where Detective Lee testifies regarding his statement. One is the evidentiary hearing, and then the other is at trial, and in these statements, he says, Detective Lee says things to the defendant, such as, we know without a doubt that this was caused by shaking, and it's either, if you didn't do it, you're, I never was clear if you were married, and I don't think you were married, your wife or your girlfriend, Melissa did this, or maybe your mother did it. Someone did this. Without a doubt, someone did this. And what Mr. Fowler says, his response is, if someone has to take blame for this, I'll take blame for it. And it's that statement that pinpoints the government's theory of where this took place, because without those statements. I just have a case that says that that kind of manipulative questioning is improper, that it makes it a grand violation. Sure. There was, we cited Tingle and Brown, which had, nothing was exactly on point, so I don't want to say this was exactly on point, but Tingle and Brown were sort of similar in that they had statements regarding parents. The government cited Cresti and Toti, which I actually thought were sort of helpful for Mr. Fowler's case, where there was types of questions that overcame the will of the defendant in all of those cases. There was no evidence in the record that she was overtaking the defendant. The evidence was? The opposite, that he concluded the interviews and said, I don't want to talk to you anymore. He did conclude the interviews, such as that. Yes. Yes. And the district court made a finding that his will was not overtaken, but the cases that we cited and similar cases cited by the government, if you're bringing someone's family or you're bringing someone's kids into the question, that's a threat, right? I'm not sure. Do you think there was a threat here? I do. Where is evidence of that? Sure. In Tingle, there was a threat to take away a child. And here it's just saying, we have evidence, and somebody that this child was killed. I thought that when I looked at the record, I think it's more than that. I think the statements are more, if you didn't do it, your wife or mother did it, along the lines of, from which group, right? Someone killed this baby. I mean, I guess you have the idea that it may have been a physician, but the government's physician and the doctor, some of the doctors anyway, thought someone killed this baby. Yeah. And at the time that the interview was done, the detective didn't even have a real understanding that that was the case. But under a thesis, that doesn't matter either, right? I mean, the government can say, and officers could say that it's more than it really is to try to get a confession. Sure, yeah. Officers can lie, and there's plenty of cases that say that. That's correct. But how Mr. Fowler responds to the, if you didn't do it, your wife or mother did it, is, take me, I want her to be with those kids. And when you look at how the questioning was done, a lot of the questioning is, when you get to the government's case at trial, it's, the theory is, yeah, there's probably shaking, but there might have been some impact or that sort of thing. But what the detective is focusing on, he's only talking about shaking. And did you shake her out of frustration? Oh, yeah, I did. Yeah. So you just disagree with the statements that the officer is saying, which I think is similar to in Preston where they did the long interrogation and Preston was basically agreeing, in 2D2, was basically agreeing to what the officers were saying in terms of what the theory of the case was. I feel like maybe we took you off track when you were looking for something that was a threat. Do you think there's something in the record that shows that the officers really threatened that, you know, the baby would be taken, not the baby, but the other child would be taken away from the family? No, I don't think there's a threat along those lines. But I think the threat is if you didn't do it, then it's your mom being mean to this baby or it's your wife being mean to this baby. So the threat is somebody has to take some responsibility or we're going after your wife, we're going after your mother. Is it just not consistent with the theory you started with today? I'm sorry, I can't hear you. Is it just not consistent with the theory you started with today, which is there are a lot of broken bones and truths that have been coming into play and obviously this baby suffered over a period of time? Yes. So what's wrong with asking that question? Well, I think at that time, I don't know that the broken bone question or the broken bones were even determined. So I don't know if the officer had that as information. No, I'm not. What I'm suggesting is this. Your theory today seems to be, look, somebody else could have done this, and there's evidence on record that it happened. Now, the officers didn't know that at the time, but they're saying, yes, well, we know that there was a shaken baby that was the cause of death. There aren't many people around the baby. It's you or your companion. What's wrong with that? Well, because it's saying if you're not going to do it. It's the defense theory is that the companion did it. Yeah. Yeah. Well, it's a possible defense. I think the bigger theory was that this was a sick child and that the broken bones were from illness, really. But then the second part of it was if this child was injured, then we don't really know who did it, because you can't use this unreliable confession to pinpoint when this happened, because we really don't know when it happened. Can I repeat? Sure. Yes, I'd like to hear you do it. Good morning, Your Honors. And may it please the Court, my name is Alexander Samuels. I'm an assistant United States attorney in Phoenix, Arizona, and I'm here on behalf of the United States. I'd like to start, as defense counsel did, by discussing the facts of this case briefly, because I do think there are a couple things that need to be discussed and perhaps corrected. The basic facts here were pretty simple. On September 24th of 2011, the victim in this case, who I'll refer to as Baby Y, was left in the sole custody of the defendant. Prior to that, she had no medical concerns or her medical history, no signs of illness. But she had a sore leg, right? She did have a sore leg, and later it was discovered that she actually had a femur fracture, and there was significant testimony at trial that femur fractures, particularly in a baby that young, are actually particularly indicative of child abuse because the baby is not ambulatory. But two hours after she was dropped off with her father, Baby Y was completely unresponsive, not breathing, and four days later she died. Now, although there was a lot of medical evidence, a lot of it boiled down to pretty simple, which is that during her short ten-week life she had no signs of illness, no documented signs of any problems, other than brief jaw dissonance who had stayed in the hospital when she was born. Every treating physician testified that she died from some form of abusive head trauma, and the autopsy confirmed that fact, finding that she died from blood force trauma. And particularly relevant to the autopsy here, because defense counsels argue now that really the key to this case, which was pinpointing the time frame, was the defendant's admissions. That actually wasn't true. And you'll notice that when the defendant made these admissions, September 27th of 2011, he was not a resident until July of 2012. They waited for the autopsy results, which took a number of months, because the autopsy results were really what pinpointed the time frame of this injury. The autopsy found that the injury was then what was called a trial of lights-out injury. It was so severe that the baby would have been immediately unresponsive, and that pinpointed the time frame when this baby was with the defendant. And, of course, the defendant admitted to shaking the baby. I'd like to talk before turning to voluntariness about the fractures very briefly. Those fractures were known about from the very beginning of this case. They were actually discussed on September 27th with the defendant, because the agents had referred them to the doctors on day two. And... Well, the agents were, they already suspected child abuse at that point, so why didn't they give him Miranda warnings? Well, conceptually, he wasn't in custody, and the evidence that he wasn't in custody is substantial. The district court found that he was not in custody. And in particular here, the defendant actually asked for water breaking. He said something along the lines of, can I at least take a break since I'm not legally bound? And the agent said, of course, would you like some water? And he went out for a water break and came back. The second time he was there, he was at his own home in his living room in February of 2012. He actually had some preliminary discussions with the agents. And then as soon as they turned to those autopsy reports, they went back to talk about the autopsy reports. And they told him that the autopsy reports were really implicated in his wrongdoing. He immediately said, we can leave now. And the interview was terminated. So it's not even really a close question, I think, whether he was in custody for either of these interviews. And this arraignment is not required. Relating to those fractures, what the evidence was in trial, and significant evidence was presented, was that there were a number of fractures throughout ABY's body. A clavicle fracture, posterior rib fractures, which is actually where hands grab if a baby is shaken, and again are pretty indicative of child abuse. And the leg fracture here dated back to a variety of dates, but none dated all the way back to birth. And in particular, one of the posterior rib fractures was shown in an autopsy, which was recently been re-broken, which may indicate that this baby was grabbed right at the time that these injuries were inflicted on it in that arraignment. The defense in trial was not really third-party culpability defense, as you can see from the trial record. It was a defense that this baby had some sort of infection. But, of course, you hear that was belied by a lot of the evidence in trial. In particular, though, I want to talk about the voluntary, just a few different statements here. There, as I think defense counsel essentially conceded, there is no case that finds admissions involuntary under certain circumstances similar to those here. I think the rule that the defendant essentially suggests is that any time agents talk about a defendant's family, this court would have to find statements involuntary. That's obviously not the rule. This case doesn't look like Tingle and Brown and other cases where this court has either expressed concern or reversed. There were no threats made here, and the defendant cannot identify any. In particular, I think one thing that's important for this court to note is that this court's factual findings. Because although this court reviews the ultimate conclusion to NOVA, it reviews those factual findings for clear error. And I think the defendant argues essentially identically on appeal, what he argued below, which is that there were threats made here, and that they were implied threats. The district court looked at the record, ruled it lead favor in order in this case, and found, as a matter of fact, that no threats were implied. I think this court would have to find those findings of clear error in order to even get to the defendant's legal analysis that this is close to Tingle and close to Brown. And not only are those findings not clear error, they're very well supported by the record. And I think the defendant, frankly, just has to misrepresent the record here in order to fit this into the facts of these cases, because this is simply not the same. There is the one statement in which the defendant expresses something along the lines of, well, if it's going to be one of us, just take me. But what the defendant doesn't talk about in his brief here is what happens immediately after that, which is that the agents then jump in and tell him, whoa, whoa, whoa, you can't do that. And I'd like to quote, actually, a couple of things that they say to him. They say, well, if one of us has deep-seated blame for it, I'll take the blame for it. And do you think that's how it works, how the law works in this country? I didn't do it, but I'll take the blame for it. And the judge says, okay, well, if you take the blame for it, you can take the blame. You understand it doesn't work like that, right? The defendant acknowledges that he agrees. They then give another example in which you couldn't falsely implicate yourself and the defendant agrees. And they then tell the defendant that other evidence in the case will reveal that he's a perpetrator. And so if he lies, all he will accomplish is implicating himself by lying to the agents, but ultimately the other evidence will reveal that he's lying. And they even tell him, you can't lie to us because lying is a crime. They encourage him on a number of casings to tell the truth. And while they talk about Missy, his girlfriend, during this interview, it's important to note that this is at the hospital only a few days after this has happened, so evidence is still unlimited. And so Missy was a suspect. Missy was questioned immediately after the defendant appeared. And Agent Lacy is fighting the voluntary decision. There's no real rival reason who went first. It wasn't that the defendant was the main suspect, so we're going to question him first and try to get a confession out of him. They were going to discuss the issues with both of the parents. They were concerned about the caretakers. This was a child abuse case. 10-week-old babies don't see a lot of adults. And so there were a lot of questions about caretakers, not just about Missy, but about other family members who might take care of the baby. And so everything that happened here is, I think, perfectly legitimate. There are no threats, and there were no coercion. And, therefore, I think the district court's findings are very well supported by the record. With that, unless the court has no further questions. Thank you, counsel. Thank you. Thank you. There was evidence that was presented in trial that this child was not a completely healthy baby during those 10 weeks. The father had talked to physicians about her having a bloated stomach, and the parents took her in on another occasion and complained about her being hot to touch, giving it to you, a total fever. So this wasn't a child that didn't have issues, and that was something that the government had argued throughout their case. This was a completely healthy baby. There's no issues. And this was one that lights out instantly. The other issues in the case regarding the statement that was brought to the jury, I'd ask the court to please look at that as well, because this was a case that hinged on experts. And a statement to the jury that criticized experts could be very important into how the jury looked at the issue, and then also the issue regarding allowing the defendant to have more time to investigate the letter that came from Mother, where basically she said, I'm sorry, this is my fault. I can't remember the exact language, but it's in the record, and I'm paraphrasing. Does the court have any other questions? And we can proceed. The case is adjourned. Thank you so much for your decision. We'll proceed to the final case of this morning, so we'll argue in calendar, which is United States v. Canada.
judges: Thomas, Friedland, Carney